# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>    v.<br><br>ICONIC HEARTS HOLDINGS,<br>INC., a corporation; and HUNTER<br>RICE, individually and as an<br>officer of ICONIC HEARTS<br>HOLDINGS, INC.,<br>    Defendants. | 2:25-cv-9310-DSF-MAR<br><br>Order DENYING Defendants'<br>Motion to Dismiss (Dkt. 14) |

Defendants Iconic Hearts Holdings, Inc. and Hunter Rice move to dismiss the complaint. Dkt. 14-2 (Mot.). The government opposes. Dkt. 16 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, Defendants' motion is DENIED.

## I. Background

Defendants develop, market, and distribute Sendit, an "anonymous messaging app designed for use on social networking platforms like Snapchat, X (formerly known as Twitter), and Instagram." Dkt. 1 (Compl.) ¶¶ 1, 13. Sendit has been available in the Apple App Store since 2018 and the Google Play Store since 2020. Id. Sendit is advertised "as a forum for users to interact with their friends on social media through anonymous messages." Id. ¶ 14. The app's pages in the Google Play and Apple App Stores describe the app as "a

service through which users share a prompt that their friends answer through responses delivered by Sendit." Id.

The app "provides a list of 'prompts' that invite anonymous responses from [users'] social media contacts." Id. ¶ 15. Responses are "anonymize[d]" with "identifying information" concealed, then made "available for the recipients to review in their Sendit inbox." Id. ¶ 16.

"Numerous Sendit users are under the age of 18." Id. ¶ 17. Rice created Sendit with the input of a 13-year-old relative and contacted that relative's similarly aged friends to encourage them to use the app once it was available. Id. Defendants also "paid several teen influencers to promote the app." Id. Defendants have "maintained a 'schools' function in the Sendit profile page," which allows users to input their elementary, middle, or high school and "find fellow users at that school." Id. Sendit has also offered a "parents" page on the Sendit website.

Sendit's website has, at times, been explicitly marketed to "users as young as 12," and Iconic Hearts has "informed many parents that Sendit is for users 12 and up." Id. ¶ 18. Sendit's website has also stated its "mission [is] to become the primary destination where every social interaction for gen alpha can happen," and "Defendants have described Sendit as a 'Gen Alpha social networking app.'" Id. "Gen Alpha is commonly understood to comprise people born no earlier than 2010, who were no older than 13 at the start of 2024." Id.

In 2022, over 116,000 users reported their age as "under 13" using Sendit's "date-of-birth profile function," and Defendants "receive[d] complaints from parents and children that explicitly reference the child's age as being under 13." Id. ¶ 19. Defendants "collected, stored, or maintained personal information from all Sendit users," including "names, contacts, phone numbers, location data, birthdates, photos, and identifying usernames on various social media profiles[.]" Id. ¶ 20. "Defendants have not provided notice to the parents of children under the age of 13 regarding the data collect[ed],

store[d], or maintain[ed]," nor have they "obtained verifiable parental consent[.]"  Id. ¶ 21.

Since 2019, Iconic Hearts has offered a subscription "Diamond Membership" on Sendit, priced at $8.99 or $9.99 per week, that allows message recipients to find out the identities of anonymous senders.  Id. ¶ 22.  Defendants promoted the Diamond Membership by showing users reviewing anonymous messages buttons reading "who sent it?" or "see hint."  Id. ¶ 23.  After clicking on the button, users were directed to "a page describ[ing] the features of the Diamond Membership."  Id. ¶ 24.  Information about the recurring nature of the membership and subscription cost is shown "only in text that is inconspicuous due to its small size, lack of contrasting color, and non-prominent placement beneath call-to-action buttons."  Id. ¶ 25.

From 2021 to at least 2024, to "increase users' engagement with Sendit and paid subscriptions," Defendants sent "fake messages— designed to look like real responses from users' actual social media contacts—in response to Sendit prompts."  Id. ¶¶ 23, 28.  Internally, Defendants "referred to these fake messages as 'engagement posts.'"  Id. ¶ 28.  Fake messages were sent 279 million or more times to Sendit users, "chosen and sent by Defendants, taken from an inventory of more than 175 fake messages."  Id. ¶ 30.  Fake messages were "provocative," "manipulative," and sometimes "adult-themed," including statements and questions like: "have you done drugs," "Does size matter," "I know what you did," "what [sic] the freakiest thing you did," and "whos [sic] ur [sic] crush," among other things.  Id. ¶¶ 30-31.  Until around late 2024, these messages "were sent to users without being labeled in any way to disclose [the sender] was Iconic Hearts, rather than one of the consumers' social media contacts[.]"  Id. ¶ 30.

Fake messages were "consistently paired . . . with the 'who sent it' Diamond Membership offer . . . to encourage the consumers to buy the Diamond Membership to find out who sent the fake message."  Id. ¶ 32.  Customers later "complained that they were tricked into purchasing the Diamond Membership because of these fake messages."  Id. ¶ 33.

Until at least June 2024, when consumers purchased the Diamond Membership they were "provided completely fabricated information" or "generic information" that provided less specific detail than Defendants represented.  Id. ¶ 38.  To reveal a message sender's display name, the consumer would need to make "an additional one-time 'Reveal' in-app purchase" for $29.99.  Id.¶ 39.

"Many consumers who purchased the Diamond Membership complained to Iconic Hearts seeking refunds and left negative reviews in the Apple App Store and Google Play Store."  Id. ¶ 41.  In February 2022, Apple "threatened to remove Sendit from its app store for violating Apple's Developer Code of Conduct" in response to complaints.  Id. ¶ 42.  In response, Rice "represented to Apple that Defendants would make the Diamond Membership more valuable by adding more specific hints and ensuring that all messages are sent by real humans."  Id.  However, Sendit did not add more specific hints "for at least two more years," "after the FTC began an investigation of Sendit," and did not ensure all messages were sent by real humans.  Id. ¶ 43.

The Diamond Membership renews automatically on a weekly basis until canceled by the consumer, charging the user $8.99 or $9.99 per week.  Id. ¶¶ 22, 46.  If displayed, material terms of the transaction are "presented in an inconspicuous manner, such as barely visible, miniscule light gray font set against a non-contrasting background, placed below the call-to-action buttons."  Id. ¶ 46.  Below are examples of disclosed terms under call-to-action buttons from 2024, before the Federal Trade Commission began its investigation, and 2025, after the FTC began its investigation:



Id. ¶¶ 26-27. Consumers complained that, "because of Defendants' inadequate disclosures, they were tricked into buying a subscription, when they intended to make at most only a single purchase[.]"  Id. ¶ 47. Defendants "rarely, if ever, provided refunds[.]"  Id. ¶ 48.

The U.S. Department of Justice, acting on notification and referral from the FTC, brought this lawsuit alleging violations of the Children's Online Privacy Protection Act (COPPA), 15 U.S.C. § 6502; Section 5(a) of the FTC Act (Section 5), 15 U.S.C. § 45(a); and the Restore Online Shoppers' Confidence Act (ROSCA), 15 U.S.C. § 8401.

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In this posture, the complaint's factual allegations are construed "in the light most favorable to the plaintiff."  Interpipe Contracting, Inc. v. Becerra, 898 F.3d 879, 886-887 (9th Cir. 2018) (quoting L.A. Lakers, Inc. v. Fed. Ins. Co., 869 F.3d 795, 800 (9th Cir. 2017)).  But "court[s] [are not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 987-88, 1008 (9th Cir. 2018) (quoting In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.

## III. Discussion

### A.    Rule 9(b)'s Particularity Requirement

For claims "grounded in fraud," a plaintiff's complaint must "satisfy not only Rule 12(b)(6)'s plausibility pleading standard but also the heightened pleading requirements of Rule 9(b)."  Davidson v. Sprout Foods, Inc., 106 F.4th 842, 852 (9th Cir. 2024).  "Rule 9(b) requires that, when fraud is alleged, 'a party must state with particularity the circumstances constituting fraud[.]'" Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)).  "[C]ircumstances constituting the alleged fraud [must] 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that

they have done anything wrong.'" Id. (quoting Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001)).

Defendants contend that "each of [the government's] purported claims" is subject to the heightened pleading requirements of Rule 9(b) because each is based on an alleged "unfair or deceptive act or practice . . . in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)." Mot. at 12.[1]  Defendants cite only FTC v. Lights of America, Inc., 760 F. Supp. 2d 848 (C.D. Cal. 2010), to support applying Rule 9(b) to claims brought under the Section 5 because the claims "sound in fraud." Mot. at 11.  In opposition, the government argues the Court should not apply Rule 9(b) to claims that "neither mention[] the word 'fraud,' nor allege[] facts that would necessarily constitute fraud." Opp'n at 5 (quoting Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003)).  The government also cites FTC v. Freecom Commc'ns., Inc., 401 F.3d 1192, 1204, n.7 (10th Cir. 2005); FTC v. Grand Canyon Educ., Inc., 745 F. Supp. 3d 803, 837 (D. Ariz. 2024); and FTC v. AFD Advisors, LLC, No. 13-cv-6420, 2014 WL 274097, at *2 (N.D. Ill. Jan. 24, 2014)), cases in which courts declined to apply Rule 9(b) to Section 5 claims, reasoning that the claims do not "sound in fraud." Id. at 6.

District courts within the Ninth Circuit disagree about whether Rule 9(b) applies to claims brought under Section 5.  As one court explained:

> The Ninth Circuit has not resolved the question of whether Rule 9(b) applies to deceptive acts or practices claims under Section 5 of the FTC [Act].  A number of district courts in the Ninth Circuit, however, have found Rule 9(b) applies to Section 5 claims because Section 5 claims "sound in fraud" by alleging the defendant acted fraudulently.  See FTC v. Lights of Am., Inc., 760 F. Supp. 2d 848, 853 (C.D. Cal. 2010); FTC v. Swish Mktg., No. C-0903814-RS, 2010 WL 653486, at *3 (N.D. Cal. Feb. 22, 2010).  In contrast, other courts have declined to apply Rule 9(b) because Section 5

---

[1] Only Counts II and III are brought under 15 U.S.C. § 45(a).

7

> claims do not require proof of scienter, reliance, or injury such that they are dissimilar from common law fraud claims.  See, e.g., FTC v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1204 n.7 (10th Cir. 2005); FTC v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 314 (S.D.N.Y. 2008).

United States v. Stratics Networks Inc., 721 F. Supp. 3d 1080, 1097-98 (S.D. Cal. 2024).

The Court need not determine whether Counts II and III must meet Rule 9(b)'s requirements because the government has met its burden even under the heightened pleading standard.  As explained below, the complaint identifies with sufficient particularity the circumstances of the alleged violations and why Defendants' misrepresentations were misleading in violation of Section 5.

While Defendants assert "each" claim is subject to the heightened pleading standard, they do not cite any authority applying Rule 9(b) to COPPA or ROSCA claims, and the Court has found none.  Count I, the claim brought under COPPA, does not rest on allegations of fraudulent conduct.  See Compl. ¶¶ 18-21, 52-54.  The Court therefore does not apply Rule 9(b)'s particularity requirements to Count I.[2]  As for Count II brought under ROSCA, the Court need not determine whether the allegations sound in fraud because, as explained below, the complaint has met Rule 9(b)'s requirements.

## B.    Violation of the COPPA Rule (Count I)

Count I of the government's complaint alleges Defendants violated the Children's Online Privacy and Protection Act, which makes it "unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the [relevant] regulations" promulgated by the FTC.  15 U.S.C. § 6502(a)(1).  The COPPA Rule

---

[2] The Court does not take a position on whether a COPPA claim could ever sound in fraud.

regulates operators' collection, use, and disclosure of personal information from children and requires operators to safeguard such information.  See 16 C.F.R. § 312.3.

Defendants argue that the government does not allege facts sufficient to state a claim for violation of the COPPA Rule because, as a threshold matter, the complaint does not support that Defendants were subject to the rule at all.  Mot. at 13.  To be subject to the COPPA Rule, Defendants must have directed Sendit to children or had actual knowledge that they were collecting or maintaining personal information from a child.  See 16 C.F.R. § 312.3.  Under the relevant regulations, a child "means an individual under the age of 13."  16 C.F.R. § 312.2.

To determine whether the website or online service is "directed to children" under the COPPA Rule, various factors are considered, including:

> its subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. The Commission will also consider competent and reliable empirical evidence regarding audience composition, and evidence regarding the intended audience.

16 C.F.R. § 312.2.

Defendants contend that "the complaint fails to allege sufficient facts to demonstrate that Sendit was directed to children under 13." Mot. at 13.  They argue that the allegations that "Sendit was created with input from a 13-year-old," "that 13- and 14-year-old relatives of defendant Hunter Rice were some of its initial users," and that "Iconic Hearts paid *teen* influencers to promote Sendit" instead support the "conclusion that Sendit was designed for users 13 and older, not users

under 13." Mot. at 13-14.  Defendants also downplay allegations that the app was promoted "for users 12 and up" and argue that the 116,000 users reporting their age as under 13 represent an "exceedingly small percentage of the Sendit user base" considering the app was, at times, downloaded 1,000 to 20,000 times per day.  Id. at 14-15.[3]

As the government points out in opposition, Defendants ignore additional facts alleged to support an inference that Sendit was directed at children under 13.  For example, users could select their school from a list of local schools that included elementary schools.  Opp'n at 8-9; Compl. ¶ 17.  Additionally, Defendants described Sendit as a "Gen Alpha social networking app" where "Gen Alpha is commonly understood to comprise people born no earlier than 2010[.]"  Opp'n at 9; Compl. ¶ 18.  In reply, Defendants argue that Sendit was not marketed for Gen Alpha "until 2024 when Gen Alpha began turning 13."  Reply at 8.  But that is consistent with the reasonable inference that the

---

[3] Defendants request judicial notice of a news article about the Apple App Store's age rating system from the website *MacDailyNews* to support their argument regarding their promotion of Sendit as for users "12 and up."  Dkt. 14-4 (RJN) at 2.  The Court may take judicial notice of facts that either are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Defendants cite two district court cases to argue it is proper to "take judicial notice of publicly accessible websites and news articles," RJN at 2, but neither of the cases Defendants cite support their request.  In both cases, the court granted judicial notice to support that the publications were in the public realm but did not rely on the publications for the truth of their contents.  See Tarantino v. Gawker Media, LLC, No. CV 14-603-JFW FFMX, 2014 WL 2434647, at *1 n. 1 (C.D. Cal. Apr. 22, 2014); Diaz v. Intuit, Inc., No. 5:15-CV-01778-EJD, 2018 WL 2215790, at *3 (N.D. Cal. May 15, 2018).  Here, Defendants ask the Court to grant judicial notice of evidence outside the complaint so it may accept the truth of the *MacDailyNews* article, having made no showing that the information contained in the article was "generally known" or that its "accuracy cannot reasonably be questioned."  Defendants' request for judicial notice of the article is therefore DENIED.

overwhelming majority of Gen Alpha members were still age 12 and under in 2024.  See Compl. ¶ 18.

The Court finds the facts alleged in the complaint support a reasonable inference that Sendit was directed at children under the age of 13.  The government alleges that defendants explicitly targeted a large group commonly known to include mostly those under 13, described the app as for users 12 and up, and in fact had over 116,000 users under 13 as evidenced by self-reported consumer data and parent complaints.  Defendants argue that "individual facts related to children under 13 . . . are far outweighed by factual allegations plainly showing that Sendit was, in fact, directed to children 13 and older."  Reply at 8. But they misstate the applicable standard on a motion to dismiss where the court "draw[s] all reasonable inferences in favor of [the plaintiff]." Shields v. Credit One Bank, N.A., 32 F.4th 1218, 1220 (9th Cir. 2022).

Because the facts alleged in the complaint support a reasonable inference that Sendit was directed at children under 13, the government has plausibly alleged that Defendants were subject to COPPA.  The Court need not consider whether Defendants knowingly collected information from children to find, at the pleading stage, that the COPPA Rule applies.  Nevertheless, the Court will briefly address Defendants' arguments regarding knowledge.

Defendants argue the government's allegations are insufficient to establish they knowingly collected information from children.  Mot. at 15-16.[4]  The complaint alleges that Defendants had actual knowledge of their collection, storage, and maintenance of personal information from children under 13 because users provided Defendants with birth dates showing those users were under age 13 and parents told Defendants that children under 13 were using Sendit.  Compl. ¶ 19.  The complaint also identifies the type of personal information Defendants allegedly

---

[4] Defendants also argue that the allegations of knowledge lack the particularity required under Rule 9(b).  Even if Rule 9(b) applied to the government's COPPA claim, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

collected, stored, or maintained from children under 13.  Id. ¶¶ 11, 20. Additionally, the government's allegations, discussed above, that Defendants were directing Sendit to children under 13 further support that Defendants knew they were collecting personal information from those users.  See Compl. ¶¶ 17-18.  Therefore, the government has sufficiently alleged actual knowledge for the Court to find Defendants are subject to the COPPA Rule.

## C.    Violations of the FTC Act

In Counts II and III, the government alleges Defendants engaged in deceptive and unfair acts in violation of Section 5.  Compl. ¶¶ 67-75. Section 5 prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  "An act or practice is deceptive if '[1], there is a representation, omission, or practice that, [2], is likely to mislead consumers acting reasonably under the circumstances, and [3], the representation, omission, or practice is material.'"  FTC v. Stefanchik, 559 F.3d 924, 928 (9th Cir. 2009) (quoting FTC v. Gill, 265 F.3d 944, 950 (9th Cir. 2001)).  "Deception may be found based on the 'net impression' created by a representation."  Id. (quoting FTC v. Cyberspace.Com LLC, 453 F.3d 1196, 1200 (9th Circ. 2006)).

An act is unfair under Section 5 if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  15 U.S.C. § 45(n).

### 1.    Use of Fake Messages to Market Sendit and the Diamond Membership (Count III)[5]

In Count III, the government alleges Defendants' acts or practices of sending fake messages to market Sendit and the Diamond Membership constituted both deceptive and unfair acts in violation of Section 5, 15 U.S.C. § 45(a) and (n).

---

[5] The Court follows the order presented in both parties' briefing to consider Count III before Count II.

Defendants argue "[i]t is exceedingly difficult to ascertain" what the government means by "fake messages." Mot. at 9.[6] The thrust of Defendants' contentions is that there is not a "sufficient factual basis to support" the conclusion that "engagement posts" were in fact "fake messages" that "were being used to trick consumers into purchasing Diamond Membership[.]" Id. at 18. Defendants assert "the Court should not be asked to assume the central factual conceit of the alleged fraudulent scheme[.]" Id.

The government alleges users of the Sendit app received messages in their Sendit inbox. Compl.¶ 16. According to the government, the Defendants sent "fake messages," internally named "engagement posts," to Sendit users from early 2021 to late 2024. Id. ¶ 28. Fake messages were "designed to look like real responses from users' actual social media accounts," and were sent on at least 279 million occasions. Id. ¶¶ 28, 30. The messages were intended to "give the [false] impression that Sendit users' real social media contacts were responding to Sendit prompts[.]" Id. ¶ 29. The government alleges these messages were, in fact, drawn "from an inventory of more than 175 fake messages." Id. ¶ 30. Customers complained after receiving fake messages and reported being deceived. Id. ¶ 33.

---

[6] Defendants devote much of their brief to comparing the allegations in this lawsuit to the allegations in FTC, et al. v. NGL Labs, et al., No. 2:24-cv-5753 (C.D. Cal. filed July 9, 2024), Mot. at 8-10, and request the Court take judicial notice of the complaint in that case, RJN at 2. Defendants argue that the allegations of "fake messages" in the instant lawsuit are insufficient because they are not as robust as those in the NGL Labs complaint. See Mot. at 8-10. But the court in NGL Labs never considered the sufficiency of the complaint on a motion to dismiss. The Court agrees with the government that "[w]hether the complaint in NGL Labs contained more, fewer, similar, or different facts than are alleged here is entirely irrelevant" and does not aid the Court's analysis. Opp'n at 13. Therefore, the Court DENIES Defendants' request for judicial notice of the NGL Labs complaint and does not consider Defendants' arguments comparing the two complaints.

The Court agrees with the government that "[w]hatever difficulty Defendants have in ascertaining what the fake messages are cannot be blamed on any deficiency in the Complaint."  Opp'n at 14. The government explains what the fake messages were, when they were sent, where they were sent, why they were sent, how often they were sent, what they said, and that customers reported being deceived. And while Defendants are correct that the Court must "assume" the messages were in fact fake, their argument is unavailing because they merely articulate the standard applied on a 12(b)(6) motion to dismiss. See Gibson v. City of Portland, 165 F.4th 1265. 1272 (9th Cir. 2026) (explaining that, when considering a motion to dismiss, the district court "accept[s] as true all well-pleaded allegations of material fact, and construe[s] them in the light most favorable to the non-moving party").

Defendants offer no other arguments to challenge the government's allegations of deceptive or unfair acts in violation of Section 5 based on their use of fake messages.  The Court finds the government has sufficiently pleaded Count III.

### 2.    Misrepresentations Regarding Sendit and Diamond Membership (Count II)

In Count II, the government alleges Defendants' representations about Sendit and the Diamond membership constitute deceptive acts or practices in violation of Section 5.  Compl. ¶¶ 67-69.  Specifically, the government alleges Defendants have misrepresented (1) the benefits a user's purchase of a Diamond Membership provides and (2) the cost and recurring charges associated with purchase of a Diamond Membership.  Opp'n at 16.

Defendants argue that the government's allegations show that a Diamond Membership's "weekly fee was repeatedly disclosed," that "terms and conditions were provided repeatedly," and the benefits of Diamond Membership were disclosed.  Mot. at 19.[7]  Further,

---

[7] Defendants also argue that "the very name 'Membership' suggests it is not a one-time purchase of a one-time service" but involves recurring charges.  Mot. at 19.  The government disputes that "membership" carries the common

Defendants contend the allegations fail "to allege when and how purchases were made," "payment information was received," and "payment was actually made," such that the complaint does not meet Rule 9(b)'s pleading standards.  Id.[8]

The government responds that Count II is based, not on allegations that the terms were *never* disclosed, but that those terms were *inadequately* disclosed.  Opp'n at 17.  The government alleges Defendants' disclosures of fees and material terms were "presented in an inconspicuous manner," including "barely visible, miniscule light gray font set against a non-contrasting background."  Id. (citing Compl. ¶¶ 44, 46).  The government also alleges the Diamond Membership was an "in-app purchase on Sendit" and Defendants failed to disclose material terms or obtain express consent from users before the purchase was completed.  Id. at 18-19 (citing Compl. ¶¶ 22-27).

The Court agrees with the government that disclosure of at least some terms does not mean that those terms were presented in a way that was not deceptive or unfair.  See FTC v. Am. Fin. Benefits Ctr., 324 F. Supp. 3d 1067, 1078 (N.D. Cal. 2018) (noting defendants' reliance on fine-print disclosures to show solicitations were not misleading "unavailing, particularly at the pleading stage"); see also Cyberspace.Com, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures").

---

meaning Defendants claim it does, arguing that some memberships are purchased on a one-time basis.  Id. at 18.  The Court also declines to assign Defendants' proposed meaning to the word "membership," as it is a reasonable inference that a membership could involve a one-time purchase or even no purchase at all.

[8] Defendants also argue that Count II fails because it relies on the existence of fake messages, which have not been sufficiently alleged.  Mot. at 19-20.  As discussed in the analysis of Count III, the existence of fake messages is a fact the Court accepts as true on this motion to dismiss.

Additionally, the Court need not take a position on whether Rule 9(b) applies to the government's Section 5 claims because the government has pleaded Count II with enough particularity to satisfy Rule 9(b)'s heightened requirements.  Though Defendants assert that the complaint does not allege specific facts about actual purchases and payments, those facts are not required to support the government's claim.  Rather, the "representation, omission, or practice [must be] *material*."  <u>Gill</u>, 265 F.3d at 950 (emphasis added).  "A misleading impression . . . is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"  <u>Cyberspace.Com</u>, 453 F.3d at 1201 (quoting <u>Matter of Cliffdale Associates, Inc.</u>, 103 F.T.C. 110, 165 (1984)).  The government has alleged that the cost, recurring nature, and benefits—material terms—of the Diamond Membership were presented in an inconspicuous or vague manner.  Compl. ¶¶ 44-46.  The complaint also alleges that consumers did purchase Diamond Memberships based on their incorrect impression of those material terms.  <u>Id.</u> ¶¶ 47-48.  Therefore, the government has pleaded sufficient facts to state a claim for deceptive acts under Section 5 based on Defendants' representations regarding Sendit and Diamond Membership.

## D.     Violation of ROSCA (Count IV)

The government alleges Defendants violated ROSCA, which makes it unlawful for any person to charge or attempt to charge a consumer for any goods or services sold through a negative option feature unless the person charging (1) provides text clearly and conspicuously disclosing all material terms of the transaction before obtaining the consumer's billing information; (2) obtains the consumer's express informed consent beforehand; and (3) provides simple mechanisms for the consumer to stop recurring charges.  15 U.S.C. § 8403.  A "negative option feature" is "an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

16

Defendants present two main arguments challenging the ROSCA claim.  First, Defendants argue that the government has not met all the required elements of ROSCA because it did not plead "that Iconic Hearts failed to disclose that Diamond Membership involved a recurring weekly charge."  Mot. at 20.  Defendants point out that the government alleges only that disclosure is too inconspicuous due to its size, color, and placement.  Id.  Further, Defendants assert that the complaint actually supports its defense because "a Sendit user sees this disclosure at least three times before purchasing Diamond Membership."  Id. (citing Compl. ¶¶ 10-14).

Defendants' challenges to the factual basis for the ROSCA claim are unavailing because Defendants misstate the required element.  Under ROSCA, the material terms of services sold through a negative option feature must be "clearly and conspicuously disclose[d]."  15 U.S.C. § 8403.  Defendants' assertions are not sufficient to challenge the government's claim where the law requires clear and conspicuous disclosure, not mere disclosure.[9]

Second, Defendants argue that the ROSCA claim is not sufficiently pleaded because the government does not provide the "when" and "how" a user is charged for Diamond Membership.  Mot. at 21.[10]  Defendants contend that the claim should be dismissed because

---

[9] Defendants do not argue, for example, that the terms were clear and conspicuous as a matter of law.  See Mot. at 20-21.  Even if they had, such a determination is fact-dependent and likely premature at the pleadings stage. Fed. Trade Comm'n v. Amazon.com, Inc., 735 F. Supp. 3d 1297, 1317 (W.D. Wash. 2024), motion to certify appeal denied, No. 2:23-CV-00932-JHC, 2025 WL 2098599 (W.D. Wash. July 25, 2025) (noting that such a finding as a matter of law on a motion to dismiss is "far from routine" and inappropriate "when it is possible that a reasonable consumer would not find disclosures of the material terms clear and conspicuous").

[10] Defendants argue the complaint is deficient because it does not allege with particularity that Defendants failed to obtain informed consent prior to charging for a Diamond Membership.  Mot. at 21.  Such allegations would be sufficient to support a ROSCA claim, but not necessary, because informed

"[the government] has not provided any information about what a user sees when providing billing information or being charged," nor does the complaint "provide[] everything a user sees and all of the disclosures[.]" Id.  Defendants do not address why this missing information is needed for them to adequately answer the complaint.

Defendants demand granular details about Diamond Membership transactions, but this level of detail is not necessary for the government to state a claim under Rule 9(b)'s heightened pleading standard.  Rule 9(b) "does not require absolute particularity or a recital of the evidence" and "a complaint need not allege 'a precise time frame,' 'describe in detail a single specific transaction' or identify the 'precise method' used to carry out the fraud." United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016) (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)).  Rather, the pleading must "identif[y] the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 540 (9th Cir. 1989).

The government has adequately alleged a ROSCA claim.  The complaint provides examples to support allegations that the material terms of the Diamond Membership were vaguely worded and barely visible, displayed in light font against a non-contrasting background. Compl. ¶¶ 44-46.  The complaint includes several screenshots showing the allegedly inconspicuous terms that were shown to users prior to purchase.  Compl. ¶¶ 22-27.  The government also provides a timeframe, alleging that Iconic Hearts has offered its Diamond Membership since 2019 as an "in-app purchase" on Sendit and that

---

consent is one of three requirements stated in the statute.  See 15 U.S.C. § 8403.  While the government does allege failure to obtain informed consent, it focuses its allegations on ROSCA's requirement that terms be clearly and conspicuously disclosed.  See Compl. ¶¶44-46, 81.  Because Defendants must have met all three requirements to charge a consumer for any goods or services sold through a negative option, allegations that Defendants failed to meet one of ROSCA's requirements are sufficient to support the government's claim.

members are charged on a "weekly basis" until they cancel their membership. Id. ¶ 22. These facts support that Defendants charged or attempted to charge Sendit users for the Diamond Membership through a negative option without first clearly and conspicuously disclosing all material terms. Therefore, the government has pleaded Count IV with sufficient particularity to satisfy Rule 9(b).

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is DENIED.

IT IS SO ORDERED.

Date: April 13, 2026

Dale S. Fischer
United States District Judge

19